

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00479-CV

MICHAEL PRIETO

APPELLANT

V.

BELL AEROSPACE SERVICES,
INC., BELL HELICOPTER
TEXTRON, INC., AND TEXTRON,
INC.

APPELLEES

----------

## FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This is an appeal from a directed verdict in favor of appellees Bell
Aerospace Services, Inc. (BellAero), Bell Helicopter Textron, Inc. (BHTI), and
Textron, Inc. (collectively, Bell) in a *Sabine Pilot* claim brought by appellant

---

[1]*See* Tex. R. App. P. 47.4.

Michael Prieto.  *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985).  We affirm.

## Background

Prieto was hired as CEO of BellAero in November 2004.  In summer 2005, BellAero acquired U.S. Helicopter (USH), a helicopter repair company located in Ozark, Alabama whose primary client was the U.S. government.  After the acquisition, BellAero[2] was composed of two divisions:  Bell Aero Support Services (BASS), which sent contractors directly to the U.S. government to perform helicopter repairs and maintenance, and USH.  Prieto hired Steve Bolton as the General Manager of USH in July 2007.

According to Brian Linden, BellAero's CFO from 2005 to 2008, although 2006 was BellAero's best year ever in terms of sales, it fell short of its annual operating plan (AOP) in 2007, in large part because USH was transitioning from a "small mom-and-pop shop" to part of a Fortune 500 company.  Scheduling and quality were problems at USH.  Nevertheless, BellAero's 2007 AOP performance was better than its 2004 performance.  According to Linden, BellAero's financials could have been better in the first quarter of 2008; it was missing its AOP by millions of dollars, mostly due to USH's performance.

---

[2]BellAero is owned by BHTI, which in turn is owned by Textron.

In January 2008, BellAero executives found out that the U.S. government was going to assign a Level III CAR, or Corrective Action Request,[3] to USH, its third in less than a year. In addition, BellAero compliance employees had been investigating Sarbanes-Oxley compliance issues at USH.

By early April 2008, Prieto was so concerned about Bolton's performance at USH that he began to document those performance issues and began forwarding emails to his immediate supervisor at BHTI, Mike Blake. In the emails, Prieto detailed specific performance issues with Bolton.

Over the next two months, employees in the human resources (HR), and ethics and compliance, sections of BHTI began several investigations into matters involving Prieto's and Bolton's relationship, compliance issues at USH, and a complaint by Prieto that Blake had forced him to hire Bolton. Additionally, in mid-May 2008, Prieto formed a team of BellAero employees to investigate allegations of labor mischarging on U.S. government contracts at USH that had been discovered by the DCAA[4] during a routine audit of USH.

Before Prieto's team completed its investigation into the labor mischarging issue, the HR director for BHTI terminated Prieto's employment at a June 5, 2008 meeting. Prieto subsequently brought a *Sabine Pilot* claim against Bell,

---

[3]A Level III CAR is unusual; the most serious type of CAR is a Level IV, which effectively shuts down production.

[4]The DCAA is a government accounting agency that performs routine audits of facilities such as USH's. It often shares information with the DCMA, a corresponding agency that investigates quality.

contending that Bell terminated his employment because he had refused to cease an internal investigation into the labor mischarging allegations and participate in a cover-up, and because he had refused to go along with a sham investigation that would have prevented him from evaluating the true extent of the allegations and reporting that information to the U.S. government.

The parties tried the case to a jury over several weeks. On the third day of jury deliberations, Bell requested a directed verdict. The trial court took Bell's motion under advisement. That same day, the jury indicated that it was deadlocked. Even after the court gave the jury an *Allen* charge, it continued to deadlock, so the trial judge declared a mistrial. However, within the trial court's plenary power, the trial judge vacated the mistrial and granted Bell a directed verdict.

## Evidence Supporting Claim

In his first issue, Prieto contends that the trial court erred by granting Bell's motion for a directed verdict. Bell contends that Prieto failed to present evidence sufficient to raise a material fact issue as to whether the sole reason for his termination was his refusal to perform an illegal act. *See id.*

### Standard of Review

A directed verdict is proper only under limited circumstances: (1) when the evidence is insufficient to raise a material fact issue, or (2) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29

4

S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied). In reviewing a directed verdict, we follow the standards for assessing legal sufficiency of the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We review the evidence in the light most favorable to the person suffering the adverse judgment, and we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827; *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).

**Applicable Law**

Texas has been an at-will employment state since at least 1888, when the supreme court held that absent a contractual agreement to the contrary, an employee employed for an indefinite term could be terminated at will without cause. *See E. Line & R.R.R. Co. v. Scott*, 72 Tex. 70, 75, 10 S.W. 99, 102 (1888); *Young v. Nortex Found. Designs, Inc.*, No. 02-11-00470-CV, 2013 WL 452181, at *2 (Tex. App.—Fort Worth Feb. 7, 2013, no pet.) (mem. op.). A "very narrow" exception to this rule was recognized in the *Sabine Pilot* case in 1985: when an employee is discharged solely because he or she refused to perform an illegal act. *Sabine Pilot*, 687 S.W.2d at 735; *Young*, 2013 WL 452181, at *3. In a wrongful termination case brought under a *Sabine Pilot* theory, the plaintiff has the burden to prove by a preponderance of the evidence that the discharge was for no reason other than the refusal to perform an illegal act. *Sabine Pilot*, 687 S.W.2d at 735; *Young*, 2013 WL 452181, at *3.

5

This very narrow exception promotes the public policy of preventing an employee from being forced to choose between his livelihood and criminal activity. *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 659 (Tex. 2012); *Physio GP, Inc. v. Naifeh*, 306 S.W.3d 886, 888 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see Young*, 2013 WL 452181, at *3. For the exception to apply, then, the act the employee is asked to perform must actually be illegal. *Young*, 2013 WL 452181, at *3. An employer who discharges an employee both for refusal to commit an illegal act and for a legitimate reason is not liable for wrongful termination. *See, e.g.*, *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995); *Cingular Wireless, L.L.C. v. Lee*, No. 13-07-00132-CV, 2009 WL 866796, at *5 (Tex. App.—Corpus Christi Apr. 2, 2009, pet. denied) (mem. op.); *McClellan v. Ritz-Carlton Hotel Co.*, 961 S.W.2d 463, 464 (Tex. App.—Houston [1st Dist.] 1997, no pet.).

**Analysis**

This was a lengthy jury trial with seven boxes of exhibits. Although much of the testimony is conflicting and of the "he said/she said" variety, the parties admitted voluminous emails into evidence. These emails provide the clearest picture of how events transpired in this case; thus, our review of the evidence will include these emails in great detail. Because the emails reference so many different people, we will first identify the primary witnesses for reference.

6

**Primary Witnesses**

The following people reported directly to Prieto as President and CEO of BellAero: Brian Linden, CFO; Ben Durrance, Director of Quality; Lou Ann Falkenstein, Director of HR and Administration; and Steve Bolton, General Manager of USH. Chris Colby, Quality Manager, reported directly to Durrance, and Lisa Baker, HR Generalist, reported to Falkenstein.

The following people were employed by BHTI: Blake, Executive Vice President/Chief Operating Officer and Chief Service Officer, to whom Prieto reported directly; Lee Tait, Senior Vice President of Quality Assurance and Chief Compliance Officer; Martha May, Chief HR Officer and Senior Vice President of HR; Ken Reeves, Director and Senior HR Business Partner, who reported directly to May; Tena Winkle, Director of Business Ethics and Legal Compliance, who reported to Tait; and Gerry Knowles, Ethics Specialist, who reported to Winkle. Blake and Tait reported directly to Dick Millman, the President and CEO of BHTI. Millman reported directly to William Clegg, the Executive Director of Ethics and Compliance for Textron.

**Prieto Voices His Concerns About Bolton**

The record shows that Prieto was concerned about Bolton's performance beginning in at least January 2008. One of the exhibits is a document entitled "Steve Bolton Performance Discussion 8 April 2008." It details issues Prieto was having with Bolton from March 2008 through May 22, 2008. In particular, on April 8, Prieto noted that he had given the Level III CAR to Durrance to handle

7

because he thought that Bolton had not dealt with it timely. Prieto sent a draft of this document to Falkenstein on April 16, 2008. Around the same time, Blake had complained about Prieto's performance to HR, and Ethics and Compliance, personnel even though for the past three years, Prieto's performance had been, in Blake's opinion, "very good."

On April 18, 2008, Prieto received an email on Blake's behalf about setting up a meeting with Blake's "high potentials." Blake explained at trial that he was supposed to meet with and mentor employees, like Prieto, who had been identified as high potential in prior reviews.

On April 21, 2008 Prieto sent an email to Blake detailing several performance issues he had been having with Bolton; he also told Blake he had met with Bolton on April 8 regarding his performance. The email concludes, "We have a series of meetings scheduled this week in Ozark and will have a better idea of plan forward. But have started exploring options with HR." Blake responded the same day with, "Thanks Mike. Keep me closely informed. This is a most unfortunate development." On April 22, 2008, Prieto forwarded Blake and Falkenstein a couple of other emails regarding Bolton.

On April 23, 2008, at 5:09 p.m., Falkenstein emailed Reeves a document containing "temporary functional alignment changes" recommended by Prieto. Prieto appears to propose that certain direct reports to Bolton at USH also become direct reports to BellAero employees within the same functions, such as Directors of Quality, Program Management, and Supply Chain. Blake sent Prieto

8

an email "late" the same day, directing him to return to BellAero from Ozark no later than close of business that day and to bring his "things."

**Prieto Voices Concerns About Blake to Tait**

On April 24, 2008, Falkenstein forwarded Reeves the April 8 "Steve Bolton Performance Discussion" that Prieto had sent her and let Prieto know that she did so. She sent Reeves additional performance documentation the next morning. On April 25, 2008, at 8:57 a.m., Prieto emailed Tait, describing Blake's email calling him back to BellAero. According to Prieto, "Since that exchange, Mike Blake has scheduled [a] meeting for Ken Reeves and I at 10[:]30. Based on the circumstances, I perceive I will be terminated at this meeting." Prieto also stated, "I wish to formally go on record about [a] situation that I have dealt with now for ten months." He then told Tait that Blake had directed him to hire Bolton in 2007 using "overwhelming" pressure. Prieto continued,

> Now after eight months with Steve as General Manager, he is not a fit. We have taken a step back rather than forward. I have significant documentation to support. I have discussed this with Mike and declared a change with Steve is necessary. I perceive my termination is intended to protect Steve.
>
> I cannot effectively perform under these conditions. This is not an acceptable work environment. It might not be an ethics issue but I don't know who else to turn to.

Prieto met with Reeves in the morning on April 25 and with Tait later that afternoon. After Prieto's meeting with Reeves, Blake sent Prieto the following email:

9

As a follow up to the meeting with Ken today I want to be clear on my expectations going forward. Pending further review and discussion that will be done in an expeditious manner, I am asking you to focus on the work at U.S. Helicopter. It is noted that some of the difficulties that were discussed today may make that difficult. However, the work being done at USH is far too important to our customers and shareholders for such distraction.

Accordingly, until further notice please execute to the established business objectives *with the organization in place* until I notify you directly. [Emphasis added.]

**Investigation into USH Procurement Practices Begun**

On April 28, 2008, Colby emailed Prieto, Linden, Bolton, Durrance, and Falkenstein about "serious process compliance issues" that had been uncovered "within the procurement process" at USH. These issues involved USH employees circumventing the normal purchasing process. Prieto forwarded the email to Tait, Winkle, Blake, Falkenstein, and Reeves, among others, on April 29, 2008, with the following message:

Attached email outlines a series of serious compliance issues at US Helicopter. Based on our discussion last week regarding other ethics and personnel issues which have triggered investigation, I believe it necessary and appropriate to solicit your assistance investigating these additional issues, outlined below.

It appears USH management was involved in these issues. In addition, one of our employees has stepped forward with written documentation substantiating the issues below. Obviously, we are keeping the identity of the individual confidential.

Tait forwarded the email to BHTI's legal department, copied to Prieto, with her own message:

I sent the below email to [BHTI legal]. We will be starting an investigation on the issues raised below immediately, and Charles

10

[with BHTI Legal] suggests using the privilege.  I will address all correspondence to you, and try to touch base in person later this afternoon.

That afternoon, Bolton emailed Blake that Prieto "said he was taking charge" of the procurement investigation and had directed Falkenstein to contact Textron and BHTI to request an investigation.  In that same email trail, also responding to Colby's April 28, 2008 email about the procurement issue, Bolton told Prieto that he had been briefed on the procurement issue and was ready to begin investigation when Colby's additional information made the issue potentially "much deeper."  Bolton stated that he was ready to support whatever action was necessary and recommended meeting with Prieto, Linden, Colby, and others to discuss the matter.  Bolton also forwarded the email chain to Blake, with the message, "I want to make sure you see this."  Blake in turn forwarded this email chain to Tait and Reeves, saying,

[H]ere is another viewpoint you both needed to see.

In any event it appears none of us knew of the purchasing issue before the startling em from [Prieto] yesterday.  Lee you will probably recall my insistence on looking at the purchasing system after we were gigged with a Level III CAR on property.  I'll ask Steve for the results of that review which may not catch an intentional violation as described.

On May 1, 2008, Durrance sent a letter terminating the services of a third party contractor at USH.  That same day, Durrance emailed Prieto, Bolton, and others, including Colby, about the termination.  Durrance also emailed Prieto and Colby indicating that he had tried to terminate the contract in the fall, but another

USH employee had persuaded Bolton to continue the contract even though it was problematic. Prieto forwarded Durrance's email to Tait, Falkenstein, Blake, and Reeves, with the message, "Attached is another ethics & compliance issue for Monday [May 5]."

**Prelude to May 5, 2008 "Investigation Team" Visit to USH**

On May 1, 2008, Blake emailed Prieto, Bolton, Tait, and Reeves, "The [May 5] visit is intended to review H.R. and Compliance issues at USH and BA first hand." The same day, Prieto emailed Tait the following:

Discussed Monday[']s visit with Mike B today.

Understand agenda will be to review: 1) 2008 objectives and performance to-date, 2) Bolton performance issues, and 3) ethics and compliance issues.

. . . .

Have concerns regarding: 1) addressing my ethics issues with Mike B in front of Mike B, 2) making sure right resources (people) are available, 3) visit will create significant distraction to our 2nd Q priorities, and 4) moving quickly through this investigation period.

The next day, Friday, May 2, 2008, Prieto emailed Blake, Tait, Reeves, and Falkenstein, recommending an agenda for the May 5 meeting:

2008 GDP Performance YTD
Level III CAR Performance
Other Performance Issues
Ethics & Compliance Issues

. . . .

It is important to move expeditiously through this investigation. Based on these performance issues, I have personally made commitments to our customers this week that I need help with.

Blake responded, "I am sure Lee and Ken will want to speak with several folks to air out any and all issues. Once back from Athens I will do the same. So I foresee folks getting their 'say.'"

On May 2, Tait emailed Reeves and May:

There are a number of issues that have come jointly to the attention of Ethics and HR regarding Bell Aero/US Helicopters, and I thought I would try to clarify the issues and the actions being taken. . . .

Issue #1
Process used to hire Steve Bolton as GM for USH
(Meeting with Prieto on 25 April 2008)

Mike Prieto has discussed with both of us his concerns regarding this issue. My perspective is that HR should conduct an initial review to determine if, in fact, the process was followed to identify, vet and hire Steve Bolton for this position. Upon conclusion of this action, HR should turn the findings over to Ethics, and we will determine if any undue influence (as alleged) took place.

Issue #2
Allegation of violation of Procurement/Finance Processes
(Email from Prieto on 29 April 2008)

Since the allegations raised in this email are related to process violations, I believe the investigation should be conducted by Ethics and Compliance, and we will involve HR as necessary when/if the disciplinary phase of the process is reached.

Issue #3
Relationship, roles and responsibilities between [sic] Blake, Prieto and Bolton
(Various soft/hard copy documentation and conversations)

I will document separately for your review and edit my perspective on what should take place to clarify this issue, and then would suggest we issue a joint recommendation to Mr. Blake for his approval.

13

Tait and Reeves collaborated on a May 2, 2008 "'Go Forward' Plan," a recommendation to Blake from Ethics and HR regarding Prieto and Bolton. Tait and Reeves's recommendations consisted of weekly meetings between Bolton and Prieto to clarify objectives, Prieto's putting Bolton on a performance management plan with clear performance objectives and regular meetings to review, and a plan for Blake to follow up in a couple of months. Tait forwarded the plan to Blake on May 2, 2008.

On May 4, 2008, Prieto emailed Tait in the same thread in which he had recommended an agenda for the May 5 meeting:

Am a little confused on couple of issues and would like to get some clarification. . . .

One, last Friday I raised with you and Ken Reeves what I believe is an ethics issue regarding Mike Blake directing me to hire Steve Bolton in July 2007. I provided written documentation of this ethics issue to Ken. Since that time, I have not received any response regarding my concern from you or Ken. The only feedback I have received is from Mike Blake. Consequently, I assume Mike is leading the investigation of the Steve Bolton performance issues, various compliance issues, and the ethics issue I have raised regarding Mike directing me to hire Steve.

Honestly, this approach seems very peculiar. I am certainly no expert on the investigation process but based on the situation there certainly appears to be a clear conflict of interest with Mike B either leading or participating in this investigation. Based on this conflict of interest, I believe the appropriate step would be for Mike B to recuse himself from the process and if he didn't then someone needs to ask him to stand aside. Honestly, I don't appreciate being put in the position of raising my issues with Mike B when he is leading / participating in the investigation. Let alone the issues regarding Steve Bolton when Mike B directed me to hire Steve. Lee, this just doesn't feel good to me. And for me that is a sign, there maybe [sic]

14

an ethical issue with the investigation.  I would appreciate if you could help shed some light on the situation.

Two, not clear what the plan is for overall investigation let alone Monday's visit.  Understand the investigation team arriving Monday will include Mike B, you, Ken, and Shannon.  Agenda will include: 1) 2008 YTD Performance, 2) DMCA Level III CAR Performance, 3) Other Bolton Performance Issues, and 4) Various ethics and compliance issues. . . .

IMHO, the situation with Steve is untenable and needs to be dealt with quickly.

Tait responded,

I tried to call you twice on Friday, but was told you were in a meeting.  I also sent you an email to that effect.  Steve Bolton's hiring is being looked at by HR to ensure we followed our processes.  In addition, Ethics is reviewing the concern you expressed to me regarding undue pressure.  In neither instance to my knowledge is Mike Blake involved, nor did I share any of our conversation with him. . . .

Prieto responded, acknowledging that Tait had tried to reach him.  He elaborated

further on his concerns:

One, until Ethics completes the investigation of my concern, Mike potentially has a conflict of interest in participating in the Bolton investigation.  IMHO, until the Ethics investigation is complete, Mike B should be recused from the Bolton investigation.  My position is that Mike directing me to hire Steve is directly linked to the performance issues I am dealing with.  Bottom-line, Steve believes he reports to Mike B and not I.  Consequently, I can't get him to respond and he obviously doesn't appear to be concerned about the performance issues I have raised with him.

Two, the fourth item on our agenda Monday is to review the ethics and compliance issues.  One of the items will be to address in more detail my allegation that Mike B directed me to hire Steve B.  It will be awkward for me to address that in front of Mike B.

15

On the morning of May 5, before the scheduled meeting at USH, Prieto emailed the following to Millman, to whom Blake reported:

Believe the following situation warrants your attention.

First of all, in July 2007 Mike Blake directed me to hire Steve Bolton. I have email documentation which I have provided to Ken Reeves. On Friday 25 April, I filed an ethics issue and discussed the issue with Lee Tait and Ken Reeves.

Second, Mike B and Team are scheduled to initiate an investigation today into Bolton performance issues and ethics and compliance issues at USH. Based on the situation, I believe Mike B has a conflict of interest and should recuse himself or someone should ask him to step aside from leading or participating in this investigation. IMHO, it is not appropriate for someone who has been accused of ethically contributing to a situation to investigation [sic], let alone judge. One of the various ethics issues to address is the very one I brought forward on 25 April.

Millman responded, "Thank you for sharing this with me. We must always err on the side of disclosure, as you have done. I will engage."

The evidence, viewed in the light most favorable to Prieto, thus shows that, as of the May 5 meeting, Prieto was primarily concerned about Blake's participating in an investigation of Bolton's performance at USH because he perceived Blake was biased in Bolton's favor and, instead of objectively evaluating USH's performance, would blame any deficiencies on Prieto rather than Bolton.

**May 5, 2008 Meeting at USH**

As of May 5, 2008, there were apparently at least three pending investigations related to USH that had been documented: (1) an investigation by

16

Tait and Reeves, initiated by and reporting to Blake, into Prieto's and Bolton's relationship and performance; (2) an investigation by Tait and Reeves into Prieto's allegation that Blake had forced him to hire Bolton; and (3) an investigation into procurement issues being performed primarily by Colby. At the same time, Prieto was evaluating Bolton's performance and exploring potential organizational changes in USH's reporting structure.

There were at least two meetings that day. Before the first meeting, Tait told Prieto privately not to discuss the investigation into the alleged improper hiring of Bolton. According to Prieto, he told her that Blake had a conflict of interest with respect to evaluating Bolton's performance issues, but she told him that she would not ask Blake to recuse himself. Blake participated in the meetings, at which USH's performance was discussed. According to Prieto, Blake began by saying that he had a long-term relationship with Bolton and he was distancing himself from any aspect of Bolton's hiring. At the conclusion of one of the meetings, Blake asked Prieto and Bolton to work out their differences; the testimony differs regarding Prieto's response. According to Prieto, Blake affirmed at the meetings that as President of BellAero, Prieto "had the authority to take any action necessary . . . at" BellAero.

**Aftermath of May 5 Meeting at USH**

After the meeting, Durrance forwarded documentation to Tait about issues he had been having with Bolton. On May 6, Prieto emailed Millman again:

17

I apologize for taking your time. But, I was disappointed with results of the Blake Investigation Team yesterday and not sure who else to turn to.

First, prior to the meeting, Lee Tait asked to speak one-on-one. Tait apologized for not linking up last week regarding status. She explained my ethics issue (Mike Blake directing the hire of Steve Bolton) had been placed in process with two investigations, an ethics and human resources investigation. I appreciated the response but voiced concern about the Bolton performance investigation and Blake's potential conflict of interest.

My perspective is since Blake directed the hire of Bolton[,] he was burdened with a conflict of interest regarding Bolton's performance and consequently needed to recuse himself from any investigation into Bolton's performance. And if Blake did not recuse himself, someone needed to ask him to step aside pending the investigation. Otherwise, his conflict of interest could damage the fairness and objectivity of the investigation into the Bolton performance issues. Tait explained Blake was not aware of my ethics issue and the pending investigation. Consequently, Blake cannot recuse himself. Tait asked me not to address this issue during our meeting. Tait's position was Blake had no conflict of interest until the investigation is complete. I disagreed. It was my opinion, the company should err on the side of conservatism and have Blake removed from the investigation into Bolton performance, rather than potentially perpetuate an ethical issue.

On 25 April, I fully disclosed my ethics issue to both Ken Reeves and Tait. In addition, I provided Reeves copies of emails from Blake documenting his direction to hire Bolton. Tait asked me not to address this issue during the investigation into Bolton performance issues on 5 May. At the end of this 5 May meeting, I was held culpable for interpersonal relationship issues with Bolton and was asked to resolve them. With the information Tait and Reeves had, neither made any attempt to bring this information forward to weigh in on the investigation. I don't know what to say other than I feel the company has betrayed me. I provided the company information to help deal with an ethical situation and the company did not step forward to help me. . . .

Two, during the meeting intro, Blake made a point of acknowledging a long standing relationship with Bolton. Blake went on to say that

18

recognizing this relationship he made a point of disassociating himself from any activity regarding the consideration and hiring of Bolton. . . .

Three, in the 5 May meeting I presented what I thought was overwhelming evidence of Bolton performance issues, including 2008 YTD AOP Performance, DCMA Level III CAR Performance, Other Performance Issues, and Ethics & Compliance Issues. However, there were no findings from the Blake Investigation Team of performance issues with Bolton, even with several examples of insubordination. Again, the conclusion was I was held culpable for an interpersonal relationship issue with Bolton and was asked to resolve. I was very disappointed with this conclusion. I am trying to make my team accountable to achieve our objectives and did not receive the support I need from the company.

It is clear from Prieto's email that he felt he was being unfairly blamed for what he perceived as Bolton's performance problems.

Prieto emailed Tait again on May 9, 2008 and copied the email to Blake, Reeves, Falkenstein, and Winkle:

On 29 April . . ., I requested your assistance to investigate the following issues [attached email thread is about procurement issues raised by Colby on April 28]. Via subsequent email on 1 May, I identified additional ethics and compliance issues for investigation [the third party contract termination issue]. During 5 May meeting in Ozark, I again presented a list of ethics and compliance issues for investigation.

I need to know if you are able to support my request for assistance with this ethics and compliance investigation. If so, I would appreciate specifics on your plan including – what, who, and when. Otherwise, I need to move forward with the investigation.

He explained at trial that he was concerned because he had not heard back on the procurement investigation and he had a responsibility to make sure it was

19

completed.  He was shocked when Tait responded in the same thread three days later:

> Since you sent me the original email below, we have spoken in person twice, on the phone at least twice, and exchanged a number of emails regarding the subject below.  As I informed you in Ozark on Monday last, the investigation is in process, with some aspects being handled by HR and some by Ethics and Compliance.  It is not policy to provide you with interim updates, so I am somewhat at a loss to understand the purpose of your email.
>
> By coming to me and to Ken Reeves, you have put the matter in our hands.  It is inappropriate and unnecessary for you to be conducting any ancillary investigation, and if you are so doing, I must ask you to immediately cease.

The next day, Millman responded to Prieto's May 6 email, in which Prieto had expressed concern about Blake's being biased in the investigation of Bolton's performance:  "Thank you for sharing your perspective with me.  I have asked Lee Tait to handle the issues below, coordinating as appropriate with Human Resources, and ensuring that we follow the established Bell and Textron processes.  She will status me once the investigations are concluded."

Although Prieto argues that the above emails from Tait and Millman are relevant to his claim that Bell told him to stand down on the labor mischarging investigation, they were sent before anyone at BellAero or BHTI was aware of any labor mischarging allegations, as explained below.

**Prieto Proposes Organizational Changes Within USH**

Meanwhile, on May 9 and 10, Falkenstein and Prieto had discussed "organizational scenarios and staffing options" for USH.  Prieto indicated that he

20

wanted to put Bolton on a performance improvement plan (PIP),[5] reassign him to BellAero headquarters in Bedford, Texas, on special assignment to Prieto, and make Durrance the acting General Manager of USH. Falkenstein sent Prieto an email entitled "PIP update," stating "Reeves will get with me this weekend on his evaluation of the USH investigation status . . . . I'm meeting with Martha May at 7:30 Monday morning via phone."

On May 13, 2008, Prieto emailed Falkenstein, Linden, Durrance, and Bolton, among others, the following email entitled "Organization Alignment":

> Under current BellAero reporting relationship, we have two relationships with Process Owners. One, Process Owner (Quality, Supply Chain, Program Mgmt/Engrg, M&S) has process but no functional responsibility. Two, Process Owner (F&A, Contracts, and HR/Admin) has both process and functional responsibility.
>
> I would like to move forward with proposed Organization Alignment, reference attachment[6]. The proposed relationship, in effect, creates two solid line reporting relationships. To effectively communicate and implement, we must better define the RAA at the intersections between Process Owner and General Manager. I would like you to take the lead in defining that relationship. Most important we . . . understand and can effectively apply our guidelines.
>
> . . . Ideally would like to roll-out . . . next week.

Durrance forwarded the email to Tait the same day.

On May 14, 2008, Prieto sent Reeves an email regarding Bolton:

---

[5]With respect to Bell, a PIP is a tool to help improve an employee's performance and is not part of a routine evaluation.

[6]This attachment appears to show the direct reporting changes that Prieto and Falkenstein had been discussing in April 2008.

Based on review of Steve Bolton's performance and skill sets, Lou Ann and I believe the facts warrant action, ranging from performance Improvement Program (PIP) and reassignment up to termination. But we will stand down until you complete your investigation.

. . . .

Time is of the essence in addressing these performance issues.

Bolton emailed Blake the morning of May 15, 2008, forwarding emails from Prieto and complaining about Prieto's having taken over a project; Blake forwarded the email to Tait and Reeves with the message, "His response indicates an unraveling situation." The same evening, Bolton forwarded another set of emails from Prieto to Blake, in which Prieto discussed the need for an executive on the second shift at USH and gave Bolton the "opportunity" to volunteer; Blake forwarded this email to Reeves and Tait as well, appending, "I called Steve tonight and asked him to forward this e mail. Working nights may not be unusual but the tone and other behavior is approaching that . . . . My reason for calling Steve is to keep open and hopeful lines of communication to the 'inside.'" Reeves responded on May 16 in the same thread, indicating, "I concluded my discussions at Bell Aero today and will be ready to make a recommendation on my findings as soon as I sort through my information."

**The Labor Mischarging Allegations Surface**

At 9:40 a.m., on May 15, 2008, Durrance received an email from Colby indicating that USH "had 8 different people tell the DCAA auditor that they had been instructed to charge to a project other than the one they were working on.

22

It is probable that DCAA will share the results with DCMA. Would some pre-emptive strikes and disclosure be appropriate?" Durrance forwarded the email to Prieto that morning, saying, "Suspect you are already on top of this. Chris made a recommendation worthy of your consideration – wanted to pass it to you promptly." Late that evening, Durrance received an email from Suzi Prescott, a USH payroll employee, indicating that during a government audit on May 13 and 14, at least nine employees had told the auditor that their foreman had either changed time on their timecards or directed them to change time on their timecards. Durrance forwarded the email to Prieto, Falkenstein, Bolton, Linden, and Colby with a "High" importance designation. He stated, "Just received this minutes ago. Very serious allegations about mis-charging of labor. Recommend immediate disclosure to Bell and agreement on investigation – resolution strategy."

Prescott's email stated that she had started timecard training with the USH employees on May 14, 2008. She additionally stated, "As of right now[,] I am in the process of pulling these employees['] timecards for the past couple of months and will give the status of those findings asap. The auditor stated he would give preliminary findings to me Monday." Her email listed by name all of the employees who had been interviewed and included the specific allegations made by one of the employees.

In response to Durrance's email, Bolton replied,

> You are absolutely correct that this is a potential serious violation. It seems to be isolated to one foreman. We have timekeeping pulling the time cards in question, checking the AWR system and work instructions. You can be assured that if deliberate mischarging occurred, action will be taken swiftly. There are specific written disciplinary procedures and actions that will be taken as appropriate. As soon as I have the facts, I will provide HR and Mike my recommendation.

Falkenstein responded the next day, May 16, with the following, which she forwarded to Prieto, Bolton, Linden, and Colby:

> I have already notified Bell Ethics of this issue. Ethics is in agreement with our investigating the issue.
>
> Kim [in USH HR] is working with Finance and Steve to investigate. I'll be kept informed and team with them on the resolution.
>
> We'll report the investigation findings and resolution to Ethics. If we need help in investigating, we'll let them know.
>
> On May 16, 2008, Bolton emailed Blake complaining about Prieto's

involvement during the second shift at USH:

> Mike, I do not know how much longer I can hold my team together with Mike P. here every week and not having any idea what he will be telling the employees. I know he is the boss and I respect that, to a point. I have done my best to keep from blowing-up and saying things I will regret. I will continue to be respectful, but the situation is becoming critical.

Blake forwarded Bolton's email to Reeves and Tait, noting "Latest report from USH. This was not requested."

24

**Bolton Forwards a Confidential Email to USH Staff**

On May 17—in the same email thread containing Prescott's email that was forwarded to Durrance—Bolton emailed Prieto, Blake, Durrance, Falkenstein, Linden, and several USH employees:

> I want to acknowledge and confirm the guidance received from yesterday's review of the ongoing annual DCAA audit. You directed me and the US Helicopter team to stand down on the investigation we had initiated and coordinated with the BellAero Human Resources and Ethics officer and Bell Helicopter Ethics office in response to a potential mischarging violation. The reason for the US Helicopter stand down is that you did not think it appropriate for me personally or US Helicopter to conduct the investigation for the following reasons:
>
> > 1.    US Helicopter has had three Level III CARs . . . from DCMA
> >
> > 2.    US Helicopter is late on one response and significantly late on another
> >
> > 3.    Fear of retribution
> >
> > 4.    US Helicopter has been ineffective in resolving issues
> >
> > 5.    This could potentially become a Level IV CAR in your opinion
>
> It is my understanding that BellAero will send an investigation team to US Helicopter headed by Ben Durrance and include Lou Ann Falkenstein, Brian Linden, Chris Colby, and others as required. In addition to the investigation of the potential violation, this team will conduct a 100% timecard audit of US Helicopter personnel. I request that Ben coordinate directly with me on his schedule and timeline to visit US Helicopter. I would also ask that Ben provide me a list of documents his team would like to review so we can assist in conducting this investigation as smoothly and efficiently as possible.

Prieto responded the next day at 4:06 p.m., "Your email yesterday shared confidential info and, consequently, was inappropriate. It is my direction you cease all written and verbal communication on this issue. . . . [U]ntil further notice it is my direction you stand down on all activities related to this issue."

At 4:52 p.m., also in the same email thread as Bolton's May 17 email, Prieto emailed Blake; he copied May, Reeves, Falkenstein, Tait, and Millman:

> Last week during an annual DCAA Labor Audit at USH, auditor discovered several discrepancies. Initially, auditor reviewed twenty-five records with approximately seven discrepancies. One discrepancy was an employee declared his management directed to charge to work order other than what he was working on. Auditor came back next day and interviewed an additional fifteen employees. Of which, eight declared management had directed to charge to work order other than what they were working on. So, we have nine of forty declaring management directing labor mischarging. When the nine were asked why they did not step forward and report this prior to the audit, their response was "concerned about retaliation".

> On Friday 1700-1900 hours, Steve Bolton briefed background and facts regarding situation. Based on the seriousness of the situation, I had no choice but to direct USH to stand down on any further investigation and directed a separate team [Falkenstein, Linden, and Durrance] conduct an independent investigation. This investigation will consist of three elements: 1) further investigate specific discrepancies including interviews, 2) conduct thorough and complete audit of USH labor charging, and 3) conduct complete process review. Team is scheduled to start Monday with a completion scheduled for 30 May.

> Steve Bolton sent the following email on Saturday. Bolton's email shared confidential information and was totally inappropriate. This email was a breach of confidentiality. There are three issues: 1) documents confidential discussion without proper notification, 2) distribution includes individuals that have no reason to know this information, and 3) disclosed employees who had declared concern

26

about retaliation.  Via separate email, I have directed Steve Bolton to cease from any further activities or discussion of this issue.

*This further demonstrates the performance issues with Steve Bolton that I have brought to your attention.  I appreciate the investigation in process but it is time to act.  Lou Ann and I have reviewed the facts and are ready to discuss our conclusion.*  [Emphasis added.]

Blake responded to all parties four minutes later, at 4:56 p.m.:  "As you know Michael we are in the middle of a complicated and thorough review led by Lee, Ken and myself with oversight from Felipe [in BHTI Legal].  Please unde[r]stand we can[]not comment on your input."

After receiving this response, at 5:05 p.m., Prieto forwarded the "Organization Alignment" email he had sent to Falkenstein, Linden, Durrance, and Bolton on May 13 to Blake, Reeves, Falkenstein, and Tait, with the following addition:

During the conclusion of your Investigation Meeting in Ozark on 5 May, as I recall you confirmed I was the President of BellAero with corresponding authority.  You asked what I planned to do and I responded with my intent to clarify and align Process Owner responsibility and authority.

I intend to implement this change next week and want to make sure I have your support.  Please confirm.

Blake responded to this email at 5:09 p.m. with, "You are to stand down pending my review and approval."

Prieto testified at trial that Tait called him after these emails were sent and

basically repeated the direction that she had sent me on the 12th of May; which was, if - - I'm to cease any investigations, ancillary investigations and that I will not be receiving any interim updates.

27

She said that: I just want to make sure you understand that my 12 May e-mail also applies to this labor mischarging situation.

Prieto acknowledged that Blake did not expressly tell him to stand down from the labor mischarging investigation but rather it "was [his] perception of what [Blake] was telling" him. According to Prieto:

> Again, that was my perception of his response to me is, any time that you bring forward evidence of fraud against the United States government, and the executive vice president of Bell Helicopter responds that, We cannot comment on your input, is inappropriate.

Prieto said that he nevertheless proceeded with the investigation he had proposed because it would have been criminal not to. He said he formed an investigative team of Falkenstein, Durrance, and Linden, who met on May 16, 2008, and that they also brought on HR Generalist Baker. The team's investigation into the labor mischarging allegations began on May 19, 2008.

**BellAero Investigation into Labor Mischarging**

On May 19, 2008, Falkenstein emailed Prieto that she had spoken with May that morning. The next day, Linden emailed Durrance, Falkenstein, Bolton, and Prieto, outlining Finance and Accounting's role:

- First Finance and Accounting will research any recent potential changes in labor charging that can be identified via time cards. To accomplish this, I've spoken with Joe and his team is in process of reviewing all time cards over the past three months to identify any cards that have had changes in time charging that required the employee and supervisor to initial. This will give us an idea of the scope of labor changes in relation to the total population over those months. We will also check to ensure that appropriate documentation (e.g. initialing of the changes) was done. This subset of data (the time cards with changes) will then be further evaluated to determine the cause/reason for the

28

changes. The purpose of this analysis will be to determine the depth and breadth of potential mischarging (if any) as it relates to changes in time cards. Any mischarging impact from here will be documented in relation to total hours charged and the aircraft/programs where changes may have occurred.

. . . .

- . . . Typically, the gathering of this information will be incomplete at best as the auditor usually withholds information such as this until after the audit report is released. We are projecting that the audit will be completed and report submitted to DCMA around the end of the month.

Prieto responded to the BellAero team, telling them not to share any information with Bolton because of his May 17 email breaching confidentiality.

**Prieto Goes Up the Chain**

On May 21, 2008, Prieto forwarded to Millman Blake's "we can[]not comment" response. Prieto added,

I again apologize for bringing another issue to your attention. But, in the attached email I have raised three serious and significant issues (mischarging, fear of retaliation, and breach of confidentiality) to members of the Bell Executive Leadership Team and the only response I received was "we can not comment on your input". IMHO, this response was negligent and irresponsible. If Mike Blake and the other members have recused themselves due to an investigation, so be it. But, these are serious and significant issues that warrant quick, decisive attention and action. Consequently, Mike Blake should direct this request to someone who should assume responsibility to respond to my request.

BellAero has a plan to conduct a complete investigation into the mischarging situation. *But relative to the fear of retaliation and breach of confidentiality, I have requested support.* I have employees who have stepped forward to share their perspective and we, as a company, have betrayed their trust with a breach of confidentiality. That is unacceptable. And as President of BellAero, *I have been directed by my supervisor, Mike Blake, to stand down*

29

*on any organizational changes. Consequently, I do not have the authority to respond and implement actions I believe are necessary to deal with this situation.* [Emphases added.]

It appears that Prieto was asking Millman to allow him to implement the organizational changes he had proposed and been told to stand down on.[7] In other words, he was advocating that those organizational changes would alleviate the potential of retaliation by USH management.

Millman's response the same day was noncommittal: "[T]he investigation is in the hands of the BHTI compliance officer and we will all be guided by the decisions of that office. Your point of view is of course important in that regard." In response, Prieto noted,

> Appreciate your response yesterday on Bolton "breach of confidentiality.["] Will stand-by but recommend expeditious closure.
>
> On another subject, on 25 April I raised ethics issue (Blake directing hire of Bolton) to Lee Tait and Ken Reeves. As part of the investigation, I assume someone from Ethics will be contacting me to schedule an interview. It has now been four weeks and no one has attempted to schedule an interview. Consequently, am concerned about the thoroughness and timeliness of this investigation.

Millman responded, "[T]he investigation is proceeding. The pace is set by the investigators and their intent on thoroughness. . . . All issues will be reviewed and resolved."

---

[7]Prieto testified that this email shows he let Millman know he was investigating the labor mischarging issues after Tait had told him not to. He also testified that Millman's use of the word "investigation" in his response referred to the labor mischarging investigation.

On May 22, Prieto forwarded two emails to Clegg, Millman's boss: (1) his May 6, 2008 email to Millman, in which he raised his concerns about the initial hiring of Bolton and Blake's continuing to head the HR investigation into Bolton's performance, and (2) Millman's response that Tait was coordinating the issues with HR. Prieto added the following message:

From my perspective, there are several ethics issues here.

1. Mike Blake directs me to hire Steve Bolton . . . prior to any interviews. . . . Violates BellAero Hiring Policy and Conflict of Interest.

2. I raise significant issues with Steve Bolton performance and intend to make organizational changes to address. Mike Blake directs me to stand down on any changes. Mike Blake leads Investigation Team into Bolton performance issues. Violates Conflict of Interest.

3. Prior to Investigation Team, I share information regarding ethics issues that have bearing on Investigation with Lee Tait and Ken Reeves. Neither brought this information forward during the Investigation.

4. Prior to Investigation Team, I bring to Tait's attention concern about Blake participating, let alone, leading investigation into Bolton's performance with burden of Conflict of Interest (Blake directed hire of Bolton). Tait disagrees and requests I not bring this information forward during the Investigation.

Clegg emailed the same day in response, "I have asked Lee to run down the facts so I'm sure someone will be in touch asap."

**Prieto's Email to Clegg Prompts Response**

On May 23, the next day, Millman and Blake came to the USH building but Prieto did not meet with them; according to Blake, Prieto "'hid' in his office," but

31

according to Prieto, he was at his hotel, and he thought he did not need to be there because the visit was tentative and would be quick. That afternoon, Ethics Specialist Knowles interviewed Prieto in his hotel room for about four or five hours; Prieto gave Knowles a large stack of documents regarding what had been going on vis a vis Blake, Bolton, and Prieto. Knowles's notes state that Prieto did not trust Blake, that he would never trust him again, and that he complained about Blake's telling him to stand down on the performance investigation of Bolton but then leading it himself.

Prieto testified at trial that Knowles told him that same day that he had substantiated Prieto's complaints about (1) the hiring of Bolton, (2) Blake's having a conflict of interest in ordering him not to make any organizational changes and heading the Bolton performance investigation, and (3) Blake's "direct[ing] [Prieto] to stand down after Bolton [had] breached confidentiality." But in his May 27, 2008 report to the Deputy General Counsel, Knowles stated that the first two complaints were unsubstantiated, that Blake would have acquiesced if Prieto had declined to hire Bolton, and that Blake's directive not to make any organizational changes was "a business decision and not a conflict of interest." He also found unsubstantiated Prieto's allegation that Reeves and Tait had failed to bring forward "ethics issues that have bearing on [the] Investigation." He noted that "[e]thics investigations are never discussed in open forum and it would have been improper for either Prieto or Tait to have surfaced them during the meeting." Knowles did, however, substantiate Prieto's allegations that Bolton

had breached confidentiality of the labor mischarging investigation by forwarding the Prescott email to USH employees.

Knowles's notes also state that when he asked Prieto about Blake's May 18 "we can[]not comment" email, Prieto said that he "discern[ed] [Bolton's May 17 email] as a major breach of confidentiality and want[ed] to take immediate action. In his interview with this investigator he planned to place Steve Bolton on investigative suspension, but was not allowed to do so by Mike Blake."

Additionally, Knowles's notes reflect that he asked Prieto why he sent both Millman and Clegg emails within twenty-four hours, and Prieto said he was "not happy with the pace of the investigation." When asked if he had any final comments, the notes reflect that Prieto said Bolton "has turned his unsatisfactory performance at USHELO into a personality conflict between him and Prieto." Knowles noted that Prieto "believes that he can hire and fire all who work at Bell AeroSpace Services except Steve Bolton who i[s] under the protection of Mike Blake."

Knowles did not recall whether Prieto revealed that he was told to stand down on the labor mischarging investigation. According to Knowles, if Prieto had done so, he would have written something like that in his notes.

The record contains a May 29, 2008 email from Knowles to his boss, Winkle, noting, "When the shop floor workers ask, '[W]hy are we working such long hours[?] Did we mess up?' Prieto tells them your management failed you.

33

In effect throwing Bolton and his staff 'under the bus.' Poisonous relationships. He needs to be ordered to stay away from here. My opinion." Winkle forwarded the email to Tait the same day.

**The Labor Mischarging Investigation Continues**

On May 29, 2008, USH HR sent a letter to one of the foremen implicated in labor mischarging by employees, which stated,

> As you know based on the results of a recent audit we are currently conducting an investigation of improper labor charging, during this review we have discovered information in your work area that will require further investigation.
>
> Based on this information we feel it would be in the best interest of all concerned to place you on a paid suspension pending the completion of the investigation. We expect the final result of the investigation to be completed no later than 9 June 2008.

That same day, Blake and Prieto had a phone call, which Falkenstein documented in an email to May:

> 1.    Mike Blake asked Mike Prieto "Have you made any headway in resolving the personal conflict with Steve Bolton?" Mike Prieto responded that "No," he had not. He didn't perceive it to be a personal conflict but an issue with Steve's performance.
>
> 2.    Mike Prieto indicated that he raised a breach of confidentiality issue regarding Steve Bolton to Mike Blake's attention and only received a response from Mike that he had no comment. Mike Blake indicated that he had not responded in that manner, that it was Lee Tait that responded. Mike Prieto indicated, No, the e-mail was from him.
>
> 3.    Mike Blake asked Mike Prieto why he didn't attend a meeting with him and Dick Millman when they recently visited US helicopter. Mike Blake also asked him if he knew that they were coming. Mike Prieto responded that he was aware of

34

their visit but wasn't invited to participate. He also stated that he raised ethics and legal issues to Mike Blake's boss regarding Mike and didn't feel it was appropriate to participate in the meeting.

At that point Mike Blake indicated that he didn't have anything else to say and the call ended.

Also on May 29, Prieto emailed Millman, Tait, and May with the following:

The following is an update to our investigation into the DCAA Audit (conducted on 13-14 May) and allegations of mischarging and fear of retaliation at USH. This investigation consists of three elements: 1) further investigate specific discrepancies including interviews, 2) conduct thorough and compete audit of USH labor charging, and 3) conduct complete process review. Our independent Team started the investigation on Monday, 19 May. Lou Ann Falkenstein, our Compliance Director, is leading this Team.

- Eight employees (direct charging) have stepped forward with signed statements that their management directed them to mischarge and were reluctant to come forward for fear of retaliation. Two of these employees were Leads who acknowledged they were directed by their supervisor to complete or change their employees' timecards. These eight employees all report to one supervisor. This supervisor has been placed on paid suspension pending investigation.

- Two additional employees (direct charging) have stepped forward with statements alleging their management directed them to mischarge and were reluctant to come forward for fear of retaliation. However, they were not willing to sign a statement. These individuals report to a different management chain from the supervisor placed on suspension. So we have reason to believe this issue is not isolated to just one supervisor.

- We continue the interviews to better define the breadth and depth of the issue across the organization. We have an additional thirty interviews scheduled. We expect to complete the interviews by 6 June.

- Once we understand the breadth and depth of [the] issue across organization, we will then conduct another series of interviews to quantify the size of the problem.

- We have reviewed the timecard procedures and training. Will start comprehensive training program next week. The labor reporting process is also under review but do not believe we have any issues.

- On 23 May, we disclosed our discovery and action plan to DCMA Enterprise. They appreciated our disclosure, especially having preceded the DCAA Audit results.

- Tomorrow, Lou Ann and I will brief DCMA Enterprise with latest information.

The attached email trail documents the issues I have previously brought to your attention. These are serious and significant issues (mischarging, fear of retaliation, and breach of confidentiality) that warrant quick, decisive attention and action.

On 17 May, Steve Bolton sent the following email. Bolton's email shared confidential information and was totally inappropriate. This email was a clear "breach of confidentiality". There are three issues: 1) documents confidential discussion without proper notification, 2) distribution that includes individuals that have no reason to know this information, and 3) disclosed employees who had declared concern about retaliation. Via separate email, I have directed Steve Bolton to cease from any further activities or discussion of this issue.

Relative to the fear of retaliation and "breach of confidentiality", I have requested support. I have employees who have stepped forward to share their perspective and we, as a company, have betrayed their trust with a "breach of confidentiality". That is unacceptable. And as President of BellAero, I have been directed by my supervisor, Mike Blake, to stand down on any organizational changes. Consequently, I do not have the authority to respond and implement actions I believe are necessary to deal with this situation.

On 21 May, you, Mike Blake, and Bob Kenney, all members of BHTI ELT, visited USH and participated in discussions with Steve Bolton. You and Mike Blake both had knowledge of Steve Bolton's "breach of confidentiality". To my knowledge, you and Mike Blake failed to

take any action on this ethical issue. Failure to take action on this "breach of confidentiality" condones this inappropriate action. This is not the kind of support I was requesting especially in the middle of conducting an investigation.

Not withstanding [sic] the fact that I have raised three serious and significant issues (mischarging, fear of retaliation, and breach of confidentiality) to members of the Bell Executive Leadership Team and the only response I received was **"we can not comment on your input".** IMHO, this response was negligent and irresponsible. If Mike Blake and the other members have recused themselves due to an investigation, so be it. But, these are serious and significant issues that warrant quick, decisive attention and action. Consequently, Mike Blake should direct this request to someone who should assume responsibility to respond to my request.

Prieto forwarded the email to Clegg asking for "support and action."

Only Tait responded:

Thank you for your update regarding the labor charging issues at USH. *Regarding your briefing to DCMA Enterprise today, please ensure that you confine your discussion with them to the facts surrounding the mischarging issue, and the actions taken to date.* Your ancillary concerns regarding Steve Bolton's email are being investigated, and are not appropriate to discuss with DCMA *at this time.*

If you would like to discuss this matter with me, I am available at either my office or cell phone number at your convenience. [Emphases added.]

Prieto contends that this email from Tait shows that he was ordered to stand down from further investigating the full extent of the labor mischarging and from informing the government that the investigation had been compromised. But he admitted at trial that he had not seen this email before his meeting with the DCMA and that he did not disclose to the DCMA that Bolton had breached confidentiality by forwarding the Prescott email.

37

**Prieto Continues to Elicit Assistance Regarding Bolton**

On June 1, 2008, the day Prieto and Falkenstein met with the DCMA, Prieto sent the following email to Tait, May, and Millman:

FYI, regarding performance and ethics investigations. The following is an outline of a phone conversation with Mike Blake Thursday 29 May around 1530 hours. Blake was calling from Italy and appeared to be in a taxi with others. It was somewhat difficult to hear with other conversations in taxi. Lou Ann Falkenstein took the call in Bolton's office. I did not see his email, reference attachment, until after our call.

Blake – I called to find out if you have made any progress on your interpersonal relationship issue with Steve Bolton.

Prieto – First of all, the issues I have with Bolton are performance, ethics, and legal. On 5 May and subsequently, I have presented overwhelming evidence and documentation of Bolton's performance issues which warrant disciplinary action. In addition on 17 May, Bolton sent an email regarding an investigation into mischarging and fear of retaliation. His email was a breach of confidentiality and compromised our investigation. This situation warrants disciplinary action.

Prieto – On 18 May, I shared this information with you and requested support and assistance. You responded with "we cannot comment on your input". *Also on 18 May, you directed me to stand down on any organizational changes. This is at least the 2nd time you have directed me to stand down on any organizational changes intended to address these performance issues.* Your response to my request for assistance with mischarging, fear of retaliation, and a breach of confidentiality was negligent and irresponsible.

Blake – I did not send you that email. That was from Lee Tait.

Prieto – Mike that email was from you.

Blake – Lee Tait directed me to use those words.

Prieto – I have no idea but the emails I reference both came from you.

Blake – Did you know Millman and I visited USH last week and why didn't you attend?

Prieto – Yes I was aware of a short visit for a facility tour along with other stops but I was not invited. But more importantly, I have legal, ethics, and performance issues with Bolton and ethics issues with your behavior. These are serious and significant issues. I cannot condone this behavior. Consequently, did not feel it appropriate to attend. I have shared on several occasions these issues and my concerns with your boss and corporate.

Blake – I guess I don't have anything else to say to you. [Emphasis added.]

Prieto forwarded this email to Clegg, who replied on June 3, 2008, "I will catch up w/Lee Tait to learn the status of the matters you raise. One of us will respond in the next several days."

Despite Clegg's response, Prieto emailed him the following on the same day:

I am absolutely bewildered by what appears to be a very slow, weak investigation process with certainly no feedback or action. Lack of quick, decisive disciplinary action condones these inappropriate behaviors. On several occasions, I have raised serious and significant legal, ethical, and performance issues to the BHTI ELT. On at least two occasions, *Blake, my supervisor, has directed me to stand down on any organizational changes intended to address these issues.*

The following is a quick summary of the issues requiring resolution.

1. July 2007, Mike Blake directs me to hire Steve Bolton (General Manager, US Helicopter reporting to President, BellAero) prior to any interviews. Also directs to cease consideration of other candidates even though Bolton has disconnects with position requirements. Blake implies TXT and Millman were involved in this decision. Violation of Hiring Policy and Conflict of Interest.

39

2.      March 2008, I raise significant issues with Steve Bolton performance and intend to make organizational changes to address. Mike Blake directs me to stand down on any changes. Mike Blake leads Investigation Team into Bolton performance issues. Violation of Conflict of Interest.

3.      April 2008, I disclose ethics issues to Lee Tait and Ken Reeves regarding Mike Blake directing hire of Steve Bolton.

4.      May 2008, prior to Blake Investigation Team I bring my concern about Blake participating, let alone, leading investigation into Bolton performance with burden of Conflict of Interest (Blake directed hire of Bolton) to Tait's attention. Tait disagrees and requests I not bring this information forward during the Investigation. Violation of Conflict of Interest.

5.      May 2008, during Blake Investigation Team, Tait and Reeves have information which I have previously provided and they do not bring forward to bear on the investigation. Violation of Trust and Integrity.

6.      May 2008, Bolton's email creates breach of confidentiality which compromises investigation into mischarging and fear of retaliation. Ethical and Legal Violation. I disclose to Blake, Tait, May, and Millman and request support. Blake's response was **"we cannot comment on your input"**. *Mike Blake directs me to stand down on any organizational changes.* At this point, Bolton should have been placed on "Paid Suspension Pending Investigation". BHTI response was negligent and irresponsible.

7.      May 2008, BellAero investigation confirms USH management directed mischarging and fear of retaliation, via signed statements from employees. BellAero has place[d] one supervisor on "Paid Suspension Pending Investigation". *Even having validated the mischarging issue and fear of retaliation, BHTI ELT has still not taken any action on Bolton's breach of confidentiality.* Ethical and Legal Violation.

8.      May 2008, Blake denies sending email with **"we cannot comment on your input"** and places responsibility with Tait.

I have been dealing with this situation for over a year now. Again, I would appreciate some support and action with serious and significant legal, ethics, and performance issues.

I trust your office is actively leading or participating in the review of these issues. [Emphases added.]

Clegg again replied,

Mike—I am indeed reviewing the investigatory [sic] alluded to in your emails. As I noted earlier, I have been in communication w/Lee Tait and her staff. I have every confidence in their thoroughness and abilities and have no reason to doubt their objectivity. I am sure that Lee or her staff will be responding to the matters raised once they have satisfied themselves with their assessment.

**Prieto's Employment Terminated**

On June 2, 2008, Reeves called Prieto and asked to meet him on June 5, 2008 at 12:30 "to brief findings from [the] HR Investigation." Reeves terminated Prieto's employment at the June 5 meeting. He also informed Prieto that Bolton's employment had been terminated. The last signed interviews by Baker are dated June 5, 2008.

The day after Reeves fired Prieto, June 6, Falkenstein emailed the following to Reeves and May, entitled "Update – BellAero communication/work environment":

Just a note to give you both an update on the communication held yesterday among the BellAero leadership team.

1. Ken held a conference call with the USH direct reports to Steve Bolton and announced that Steve was no longer with the organization. The meeting was short and there were a number of questions regarding – who's in charge? What is next? And will there be an end to the constant audits, CARs etc.

2. Ken held a conference call with the BellAero ELT reporting to Mike Prieto and announced that both Steve and Mike were no longer with the organization. Discussion involved what should be communicated to the rest of the organization and customers. It was determined that nothing would be communicated with the customers at this time.

3. I coordinated a joint meeting immediately following the above with the two leadership teams to discuss consistent communication and next steps:

a. Verbal communication to employees would indicate that both leaders were no longer with the organization

b. The team decided nothing should be communicated to the customers at this point

c. Ben Durrance would contact the DCMA

d. Stressed the need to continue business as usual – keeping the customer focus

e. Teaming among the leadership team to address issues and support each other in support of the business

f. Be aware of how the leadership responds impacts the culture of the organization.

The meetings were well received from the standpoint of communicating the information as soon as possible. Everyone was shocked at the changes but are looking forward to making the business successful.

Finally, on June 11, 2008, Falkenstein emailed Tait, Knowles, and Winkle:

"Let's discuss the results of the labor mischarging investigation. I'd like your input before we take disciplinary action. . . . Attached is a summary of the investigation for reference."

The attachment, entitled "Internal Investigation Interviews @ BellAero-US Helicopter Site," states that fifty-five internal investigation interviews had been completed since May 19, 2008, that eleven of the fifty-five interviewed "made allegations of labor mis-charging," that the allegations were made in avionics, that an avionics foreman had been suspended pending the investigation, that he and another foreman implicated a manager who denied involvement in labor mischarging but was nevertheless placed on suspension, that one of the foremen admitted guilt on June 5, 2008, that the team was "able to substantiate 53.4 hours of labor mis-charging from looking at timecards," and that the manager had admitted to using "1199 indirect time[8] for rework . . . to move the work along." The attachment also shows that "HR and line management" recommended "[t]ermination for both employees based on labor mis-charging."

Falkenstein testified that the investigation ended June 11, 2008.

The DCAA's formal audit report is dated June 20, 2008. The record also contains Bell's response dated July 7, 2008. That response, written by BellAero's "Controller EDA," notes that BellAero and USH investigated by pulling every time card over the "previous three month period." Of the time cards pulled,

_____

[8]Indirect, or 1199, time appears to be time that is not attributable to any one contract, which was used by at least one of the departments to avoid cost overruns by keeping time actually billed to a project artificially low. It is time billed to USH and not the government on any contract. Thus, for any labor mischarging involving overruns that were charged to indirect time, the mischarging did not transfer hours to a different government contract, mitigating the effect of the mischaracterized hours.

4.4% had "line throughs," but some were mistakes that did not affect billing (such

as vacation time that was marked when it had not yet been earned). As reported

by Bell, this search

> netted 8 time card changes that may have represented directed mischarging. Note that even these could include valid reasons for generating the 'line through' but from an objective standpoint, it was the only way to identify potential problems via analysis of the time card itself. The conclusion to this analysis was that the worst case for 'line through' mischarging was .7% (8 possible mischarged line throughs'/ 50 sample size * 744 total 'line throughs' / 17,000 total time cards) of the total time cards (Note – line throughs on a time card do not usually amount to a full day so the % in hours will be much less).
>
> *BA/USH recognizes that this analysis is a limited approach to investigation of the incidents. It is possible for time to be mischarged without having a 'line through' although the extent of this type of incident cannot be determined via time card analysis.* Therefore, BA/USH initiated the second prong of the approach to the investigation which consisted of a series of interviews with fifty five (55) employees . . . . *A second round of interviews was conducted with this group.* To facilitate discussion in the interview their timecards were pulled for the prior 12 months and all 'line throughs' were tagged. Eight of the eleven work in the Avionics Station under the same supervisor. *This in depth round of interview[s] yielded 53.4 hours that were substantiated as being mischarged.*
>
> . . . .
>
> . . . The interviews documented much of the mischarging went from charging "direct" to "indirect" and not to another USG contract thus further mitigating any other contract overages. [Emphases added.]

Although Falkenstein's report and this report mention fifty-five initial

interviews and a second round of interviews, the record contains written interview

reports for only fifty-one employees[9] and no evidence that a second round of interviews was conducted as described.

### Testimony About Labor Mischarging Investigation

Falkenstein, Linden, Durrance, and Baker—all of whom were on Prieto's labor mischarging investigation team and all of whom testified that they regularly met with Prieto as a team about the investigation—testified that no one ever told them to stand down from investigating the labor mischarging allegations. The suspended foreman testified by deposition that he did not recall being interviewed by anyone other than a female BellAero employee, who could have been Baker, about the labor mischarging allegations. That foreman also testified that he never intentionally instructed an employee to intentionally mischarge time from one category to another and that he only instructed an employee to charge time to overhead instead of an individual machine when authorized to do so by his supervisor.

Falkenstein and Durrance testified that the team did not do all of the thirty interviews Prieto had contemplated in his May 29 email to Millman because they found that the employees had exaggerated the extent of the mischarging. One of the employees had said that she had a spreadsheet about the actual time mischarged, but Baker testified that the employee could not produce the spreadsheet when Baker asked for it. Prieto testified that he had talked to the

---

[9]One of Prieto's emails references the fact that some employees were too afraid to sign a written statement.

45

employee himself, told her he would come back for the spreadsheet later, and was convinced that she had it and would have given it to him had he not been terminated. Prieto testified, and the employee's written interview shows, that she was worried about retaliation. This employee was interviewed by Baker on May 22, 2008 and did receive "counseling" as discipline for participating in mischarging.

Although Baker did not participate in pulling timecards, she conducted the majority of the interviews into the labor mischarging allegations. She testified that she met with Prieto daily while doing the interviews to update him and that after he was terminated, she met with Falkenstein. Although Falkenstein said Baker gave her both a written and oral final report, Baker testified that she did not prepare a final written report and no such report was introduced into evidence. Baker interviewed only those employees who had visible alterations on their timecards, and she did not do a second round of interviews. Three employees who had said they had written documentation of mischarging were not able to produce that documentation when Baker followed up. She confirmed that the allegations were isolated to ten or eleven employees who worked for the same foreman. Baker testified that she did not discontinue the investigation when Prieto was terminated and that the results that Bell reported to DCAA are what she reported to Falkenstein.

Tait testified that although some employees were disciplined for knowingly participating in the labor mischarging, they were not disciplined for participating in

the investigation itself.[10]  According to Tait, Bell fired Prieto because management had lost confidence in his ability to lead.  She did not recommend firing him, but she agreed with the decision.  She attended the meeting where the decision to fire him was made in late May or early June 2008; Blake may or may not have been involved in that meeting.  Tait denied that Prieto was fired to stop his reporting illegal conduct.  She confirmed that Falkenstein took over the investigation after his employment was terminated.

May testified that the decision to fire Prieto was made in late May or early June 2008, but before that, Reeves had come to her recommending that he be terminated.  Millman decided to terminate Prieto.[11]  Reeves and Tait updated Millman, but Blake was not at the meeting.  According to May, Bell had lost confidence in Prieto's ability to lead.

Reeves confirmed that on or a little before April 25, 2008, Blake had asked him to "sit down with" Prieto and Bolton and "explore those issues" regarding their relationship.  He confirmed that the decision to fire Prieto was made at a meeting in Millman's office and that he had earlier recommended in a meeting with Bell counsel that Prieto be fired.  He said that May and Tait decided to fire Prieto but that Millman had the final decision.  Reeves testified that both Prieto's

---

[10]The evidence shows that a foreman and manager were suspended for several days and two leads received written reprimands.

[11]Prieto's counsel read from discovery in which Bell initially answered that Blake decided to fire Prieto; that discovery was later supplemented to state that Millman decided to do so.

and Bolton's teams thought the relationship was not salvageable. Reeves also said that he told Prieto he was being fired for failing to work out his relationship with Bolton.

Millman testified that he thought Prieto had been allowed to handle the labor mischarging investigation and that Tait had appointed him to do so. He knew Prieto was moving forward on that investigation because of Prieto's May 29 email. Millman testified that he personally did not take steps to report the labor mischarging or to quantify the amount of labor mischarging. Millman said it was his decision to fire Prieto, that the final decision was made between a week to ten days before Prieto's final termination date, and that he decided to do so because of the poor performance of Prieto's unit, complicated by the serious wrongdoing that had occurred at USH "for which [Prieto] was ultimately responsible." He agreed that "the violations going on in labor charging were a trigger point for [his] decision to terminate" Prieto's employment. He also agreed that Bolton's performance had not been good. He said he never told anyone to stop the labor mischarging investigation.

Prieto testified that as of April 2008, he had received positive feedback from Blake and had received a raise, which was tied to performance. At the April 22 meeting, Blake told him he was a high potential employee, was doing great things with little oversight, and was setting the standard for ethics and compliance. According to Prieto, he never got feedback about the 2008 AOP, and BASS was exceeding its AOP. He said he told Blake that the 2008 AOP

48

was a "stretch target" but Blake told Prieto to "give it your best shot." Prieto was under the impression that after the April 25 meetings, he would hear back from Reeves and Tait because Reeves told him he would get back to him quickly and Tait said she would get back to him within the week.

According to Prieto, before he was fired, he had a plan to quantify the amount of mischarging that had occurred and had prepared a matrix containing estimates of potential mischarging amounting to between nine and seventy-five million dollars that USH would have had to pay back to the U.S. government. But he never showed this matrix to anyone and it was not introduced into evidence. According to Prieto, based on the facts he saw and the information he had before he was terminated, the investigation into the labor mischarging allegations was not completed as planned.

**Evidence Not Sufficient to Raise a Material Fact Issue**

Viewing the record in the light most favorable to Prieto, the following facts are supported by some evidence: (1) Blake was protecting Bolton to Prieto's detriment, (2) the timing of Blake's "we can[]not comment" email suggests he did not wish to communicate with Prieto about the labor mischarging investigation even though the email was clearly in response to Prieto's email asking to make organizational changes at USH as a way of addressing Bolton's performance, (3) Tait verbally ordered Prieto to stop the labor mischarging investigation sometime between May 18 and May 29, 2008, (4) no additional employee interviews were completed after the day of Prieto's termination, and no second

round of interviews was conducted as communicated by Prieto to Tait, Millman, May, and Clegg on May 29, 2008 and by BellAero to the DCAA in its final report, and (5) Millman's reasons for terminating Prieto's employment differed from the reason given to Prieto by Reeves.

Nevertheless, the evidence that cannot be disregarded also shows that (1) even if the missed AOP in the first quarter of 2008, the three Level III CARs, and the compliance issues at USH were not Prieto's fault and his hands were tied to make organizational changes to address his issues with Bolton, they all occurred while he was the President of BellAero, (2) none of Prieto's labor mischarging investigative team—with whom he was regularly meeting during the interview process—testified that they were ordered to cease investigating or were told not to perform a thorough investigation, (3) in Prieto's emails to upper management, he never complained about being told to cease the labor mischarging investigation, only his inability to make the organizational changes he thought necessary to deal with the USH management problems, including the employees' fear of retaliation regarding the labor mischarging allegations that Prieto attributed in part to Bolton's confidentiality breach, (4) in response to Prieto's May 29, 2008 email detailing the investigation his team had been conducting, Tait knew he was discussing the "labor mischarging issue" and asked him specifically to confine his discussion with the DCMA to that issue, rather than expressing surprise that he had continued the investigation or ordering him to stop, (5) Blake had already initiated an active investigation into

50

Prieto's relationship with Bolton, which had been eroding, before the labor mischarging allegations were discovered by the DCAA auditor, and (6) there is no evidence to support that more than 53.4 hours of labor mischarging occurred at USH.

Thus, although we are not convinced there is sufficient evidence in the record to support a conclusion that Prieto was terminated to cease the investigation and cover up more extensive labor mischarging than the 53.4 hours reported by BellAero to the DCAA, even if there were sufficient evidence to support such a conclusion, Prieto has not raised a material fact issue that this was the sole reason for his termination. Although he claims all of the other reasons urged by Bell are pretextual, he has not presented evidence sufficient to raise a material fact issue disputing those reasons, i.e., that his unit was suffering from performance and compliance issues and he was not able to work out his differences with Bolton. That Blake may have helped contribute to these reasons by refusing to allow Prieto to fire, demote, or reassign Bolton is not sufficient; the other reasons for termination need only be legitimate, not necessarily fair. *See Hinds*, 904 S.W.2d at 633; *Cingular Wireless*, 2009 WL 866796, at *6–8; *Robinson v. Devereux Found.*, No. 14-01-00081-CV, 2002 WL 1315631, at *2–3 (Tex. App.—Houston [14th Dist.] June 6, 2002, pet. denied) (not designated for publication); *Griffith v. Wyndham Travel, Inc.*, No. 05-97-00372-CV, 1999 WL 595818, at *4 (Tex. App.—Dallas Aug. 10, 1999, no pet.) (not designated for publication); *cf. Ball v. Duty Free Ams., Inc.*, No. 4:08-CV-0232, 2009 WL

51

780915, at *5 & n.70 (S.D. Tex. Mar. 23, 2009) (mem. op. and order) ("Topiol's documented dissatisfaction with Ball's work clearly was a legitimate reason for her termination, whether or not Ball agrees with his assessment of her performance."). Accordingly, we conclude and hold that the trial court did not err by granting the directed verdict. *See also Roberson v. Corp. for Econ. Dev. of Harris Cnty., Inc.*, No. 01-03-00566-CV, 2004 WL 2366937, at *3 (Tex. App.—Houston [1st Dist.] Oct. 21, 2004, no pet.) (mem. op.) (holding that *Sabine Pilot* claim was not available to plaintiff because she alleged that she was fired for continuing to act legally rather than refusing to do something illegal). We overrule Prieto's first and dispositive issue.

## Conclusion

Having overruled Prieto's dispositive issue,[12] we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and MEIER, JJ.

DELIVERED: October 17, 2013

---

[12]*See* Tex. R. App. P. 47.1.

52